We will hear argument next this morning in Case 10-313, Talk America, v. Michigan Bell and the consolidated case. Mr. Bursch. Thank you, Mr. Chief Justice, and may it please the Court. Interconnection is the lifeblood of local phone competition. That is why in Section 251c2 of the Telecommunications Act, Congress guaranteed that competitors would have interconnection at the location and at the method of their choosing and at TELRIC rates, irregardless of market impairment. The question in this case is whether that 251c2 obligation encompasses the tens of thousands of existing entrance facilities that even today are interconnecting competitive  And the answer to that question is no. You get c2 at TELRIC rates? Yes, you do, Your Honor. You get c2 and c3 at TELRIC rates. And so the answer to the question presented is yes for three reasons. First, because the FCC says so. And as the expert agency charged with interpreting and implementing the Act, that conclusion is entitled to deference. Second, the FCC's conclusion is consistent with the plain text of the statute and the implementing regulations. And third, the FCC's conclusion is consistent with the policies embodied in the Act, because the practical result of affirming the Sixth Circuit opinion in this case is that a competitive carrier, like Sprint, for example, will be forced to either charge its customers more for interconnection or lay tens of thousands of duplicate entrance facility cables.  I'd like to start with the Sixth Circuit opinion. And specifically, this is at page 20A of the Talk America cert petition appendix, because this goes to the heart of AT&T's position and the Sixth Circuit's conclusion with respect to the orange plugs and cords analogy. You'll recall that the Sixth Circuit said this was like a situation where a homeowner had a plug in their garage and a long orange cord extending out to a park, which the Court called the entrance facility, and then the competitive carrier would be that person in the park. On page 20A of the petition appendix, in footnote 9, about halfway down, this is the key flaw in the Sixth Circuit's reasoning. The Sixth Circuit says if you as the homeowner, that's the competitor – I'm sorry, that's the incumbent, had said that they may plug into the surge protector, then the big orange extension cord is just an entrance facility. But if you had said they must plug into the big orange extension cord, then the big orange extension cord becomes the interconnection facility, and consequently the park goers, the competitors, may plug into it. The problem with this is that the Sixth Circuit was wrong in that the incumbent doesn't get to choose where the point of connection is. The statute and the regulations in the FCC make clear it's the competitor that gets to choose. So if the competitor chooses the end of the extension cord, where it connects to the CLEC network in the park, then even the Sixth Circuit agrees with us and the Seventh, Eighth, and Ninth Circuits that the entrance facility is the interconnection facility. Kennedy, but each of them wants to connect at a different point and in a different way. Must the incumbent accommodate both if they're technically feasible? Justice Kennedy, the answer is yes. The statute gives the competitive carrier the opportunity to choose the point and the method, all at tolerant rate. Ginsburg, Doesn't it say something about feasible? It doesn't give free choice entirely. It says, what are the words? It says that the interconnection doesn't have to be put just any place. If it's not feasible or it's undue expense or something to that effect. Justice Ginsburg, the statute and the regulations make clear that it must be technically feasible, but there is an almost irrebuttable presumption that when there are already facilities in place performing that function, that is technically feasible. But you want the incumbent here to build the orange cord and extend it to wherever you have your switching equipment. And what they say is, no, you bring your switching equipment here. We'll allow you to connect at, you know, the end of our facilities. But by God, you make your own connection to the switches. Now, moreover, you're making them, you'll pay them for the orange cord, but only at telrec rates, which are not realistic. Now, why are they wrong, and you're right, especially when you have legislation, the purpose of which was to encourage the independent building of new facilities? I mean, it's clear that the Act wanted these new entrants where possible, to build new facilities and not simply to glom on to the extant facilities of the incumbents. Three responses to that argument, Your Honor. First, this case is about existing facilities, not about facilities to be built, although there's a lot of talk about that. This isn't a head-on challenge to the statute of the regulations. The procedural posture is that this was AT&T trying to get out of arbitration agreements that it had for existing entrance facilities, and so that's the posture of our case. Scalia, Well, but the logic of your case, as you described it, would also require AT&T to build out the orange cord. Right. And two additional points, Your Honor, on that. First, they say this is a large obligation because we're talking about miles and miles. That is not the position that AT&T took with the FCC when they were commenting on the TRRO. At page 16A of the Michigan Blue Brief, in footnote 397 of the TRRO, the FCC acknowledges AT&T's statement that entrance facilities involve very short distances. In addition, we have the FCC's regulation and the local competition order, paragraph 563. Scalia, excuse me. Excuse me. Yes. Extant entrance facilities, I assume they were referring to. Yeah, I believe that's correct, yes. They're very short distances. But if you asked for a longer distance, they would presumably have to build it. Well, not necessarily in that case. To charge you until records. Right. Because the FCC has promulgated in 521 the meet point obligation, which is another way that you can have interconnection, and that demonstrates two things. First, that sometimes AT&T, as the incumbent, is required to build out facilities, that it's not just a passive obligation. But in addition, when they're talking about meet point, they say that it's up to State commissions to decide the appropriate and reasonable distance. So even if we were presented with the case, not this case, but a different case where you're talking about what's the appropriate length of the facilities, the FCC has already acknowledged there could be some reasonable limits on that. And the most important fundamental point, the fourth point on this, is that Congress already in C-2 said you're going to have interconnection without regard to market impairment. And so we're not going to look at the availability of other entrance facilities in the market. If a competitor asks to have this location and this method and it's technically feasible, they do get the TELRIC rates. And the competitive carriers would take issue with the presumption that TELRIC rates are unfair. You know, the regulations do contemplate that they're going to recover not only their cost, but a reasonable profit. And we can disagree about the congressional wisdom of requiring rates like that, but in the Verizon case, this Court definitively put to bed the question of the reasonableness of the TELRIC rates. Breyer, where would I read this? As I read the statute, the statute says the cheap system here is where they provide they have a duty to provide the incumbent interconnection. Okay? That requires some physical stuff. Yes. Okay? And they have to pay, you're not charged a lot for that. There's a limit on what they can charge you for the interconnection. Correct. Now, somebody is going to have to decide whether if Pacific Tel-and-Tel is being tried to force to connect with Maine, you know, they have to pay for a wire across the country to get the interconnection or not. That seems unreasonable. Across the street, maybe they do. My candidate would normally be the FCC or some regulator decides that kind of thing. And it's up to them to say whether this is or is not what's needed for interconnection. That would be an intuitive account I would have without having read the statute in depth. So now what do I read to find out how this works? What is it that distinguishes something that is ridiculous, like my California example, from something that makes a lot of sense, like they're next door and have to make 50 feet of wire? Justice Breyer, if you look at paragraph 553 of the local competition order, which appears at page 27A of the Michigan Blue Brief. Michigan Blue Brief. At least that's where it begins. If you flip over to page 28A, this is the second page of the paragraph. Very good. About halfway down the paragraph there, it says, Regarding the distance from an incumbent Lex premises, that an incumbent should be required to build out facilities for meet-point arrangements. So again, this is in the meet-point context. We believe that the parties and State commissions are in a better position than the required reasonable accommodation for interconnection. So again, this is the FCC speaking. The FCC is speaking. And the State commission says they say it's up to the State commission, and the State commission here said? Well, here the State commission didn't say anything, because we're talking about existing facilities. There's no one requesting a new entrance facility to be built, for example, from Lansing to Detroit. That's not this case. This case is about the existing facilities. Mr. Bursch, the key to your case is that an entrance facility is interconnection, right? Correct. You have to equate those two terms. I do. What do you rely upon to equate them? Because the as I read the regulations, they use them as separate terms. Regulation 51.5 defines interconnection as the mutual or I'm sorry, as the linking of two networks for the mutual exchange of traffic. There is no dispute that an entrance facility physically links a competitive network with an incumbent network. Thus, when that entrance facility is used for the mutual exchange of traffic, it is providing interconnection. And that's exactly what the FCC has concluded. Doesn't the interconnection, doesn't it have to be part of the internal system of the incumbent carrier? It has to be part of their network. But in the TRRO, the FCC made clear repeatedly that entrance facilities constructed by incumbents are part of their network. And so there's really no dispute that it can be part of the network. You say that this is a link, and your the opposition says that it's a transport. Is that correct? It is transport. By definition, interconnection has to include transport because it involves the mutual exchange of traffic from one to another. But the Reg says interconnection does not include transport. Well, we addressed that point at length in our reply brief, because AT&T advances that argument, and it's really a fundamental misconception or misunderstanding of the regulation. 51.5 uses. I've got it in front of me. It says this term does not include transport. But you say it does? Yes. Well, the entrance facilities do include transport, all interconnection facilities. No, I talk about interconnection. Right. What 51.5, I assume that's what you're looking at. Yes. That goes to a term of art or a phrase of art, transport and termination of traffic. And as the FCC made clear in its regulation 51.701, which is at page 35A of the Red Brief, what they're really distinguishing there are the two types of charges. You have 251C2 interconnection charges, and you have 251B5, transport and termination of traffic charges. And those are two separate concepts. The interconnection charge runs from the competitive network to the incumbent network. The transport and termination of traffic charge runs from the point of interconnection to the inoccumbents and customer. And that's very clear. The Ninth Circuit specifically acknowledged that point in Note 16 of the Pacific Bell case. But common sense tells you that has to be right, because under AT&T's view, the way they interpret 51.5, there would be no interconnection obligation, because there's always going to be transport, a mutual exchange of traffic when interconnection is involved. Is that right? Or is there a mutual exchange of traffic when you're talking about backhauling? No, there is not. And we don't take that position. The mutual exchange is when a competitive customer talks to an incumbent customer or vice versa. Everything else we can call backhauling, and that's not what is at issue when we're talking about 251C2. Breyer. Breyer. Can I go back to my question, because I haven't got an answer? Yes. You see, I would think you said, well, this is an existing facility. Yes. But my intuition would be that makes no difference whatsoever. You could have some kind of mechanism that connects two companies. Now, half of it is a simple wire, and half of it is bells and whistles. And so we have to decide which part is the part that's necessary for the interconnection and which part is some kind of, well, I don't know, extra bells and whistles, and therefore, since it's not an impairment kind of problem, they have to pay full price for it. That, again, seems like the kind of job that Congress would leave up to a commission. But I guess I want you to tell me who's to decide that kind of thing, and how do we decide it? Are you talking about the distance or what else would be necessary? I don't know what it is. Often these things are not distance. Often a connection is all kinds of complex things, you know, and some are necessary and some aren't, but I can't you imagine with me the same kind of California problem arising, but it just arises in kind rather than in distance? If I'm so far off base, you can't get the question, forget it. I mean, I might not be able to get it. I think it's a very good question, and I'll take it in two parts. You know, again, with respect to distance, in the meet point context, the FCC has already delegated in LCO paragraph 553 appropriate and reasonable distances. With respect to the bells and whistles, it's really not that complicated. You've got a cable, that's your entrance facility, you know, typically a fiber optic cable, and there's going to be a conduit that it needs to run through. There might be, you know, risers or spacers with little twisty ties or something similar to that, zip cords, that will allow the cable to be run into a building and up a wall and connect into the appropriate place. But to the extent those are interconnection facilities, those are necessarily part of the 251c2 obligation. And unless there are any further questions, I'll reserve the remainder of my time. Roberts. Thank you, counsel. Thank you. Mr. Miller. Mr. Chief Justice, and may it please the Court. There are a lot of statements by the FCC at issue in this case, but I'd like to focus on two statements by the commission in its published regulation and orders that, taken together, resolve the question presented here. And the first is the commission's determination in 47 CFR 51.305e, which appears at page 5A of Michigan's brief, that it is the competitor, not the incumbent, that gets to select the point at which interconnection takes place. And specifically, that regulation says that if an incumbent wants to deny a request for interconnection, it has at a particular point, it has the burden of proving that interconnection at that point would be technically infeasible. And that undercuts a key premise of the decision below, which was that as long as the incumbent provides interconnection at some technically feasible point that it has selected, then it's discharged its obligation. And if the competitor doesn't like it, that's just too bad. They can build their own facility if they want to interconnect somewhere else. That's the point. Sotomayor, underlying that question is an issue that I think Justices Ginsburg and Scalia were asking. If a facility is technically feasible, technically feasible is different from economically ridiculous or economically burdensome. How does that economically burdensome, does it get considered by anyone, so that because one could imagine, as Justice Breyer said, that a competitor could come in and say, now build me the Taj Mahal. As an entrance facility or as an interconnection facility. So is there anyone controlling for that latter issue? In terms of the definition of technical feasibility, that's a defined term in section 51.5 of the regulations, and it does not include economic considerations. Nonetheless, as the commission explained when it adopted those regulations in 1996 at paragraph 209 of the local competition order, competitors have an incentive to ask for an economically efficient means of interconnection because they have to pay for it. I mean, the AT&T, they don't pay as much as AT&T would like because they're paying TELRIC rates, but they do still have to pay for interconnections, so they have incentives to ask for a reasonable method of it. And what's at issue in this case, to get to the second part of your question? Ginsburg-Miller, and that's why it's only technically feasible, because the economic burden is not on the company. It has to provide it at the place if it's technically feasible, but it doesn't pay for it. That's right. Mr. Miller, you began by saying there were two regulations that disposed of the case. You've got one. What's the second? The second is the commission's determination in the Triennial Review remand order in response to the D.C. Circuit's remand of its previous order that entrance facilities are indeed part of the incumbent's network, because the statutory obligation, of course, is to allow interconnection at any technically feasible point within the incumbent carrier's network. Where do I find that? That's in paragraph 137 of the Triennial Review remand order, which is at page 10a of Michigan's brief. And in the preceding paragraph, the commission traced the history of its definition of the dedicated transport network element in the local competition order, its revision of that in the Triennial Review order, in which it had said that those facilities are not part of the network. The D.C. Circuit then vacated that. Scalia What section are you referring to on page 10a? Which one is it? Miller, I've just gone back to the previous two pages. But 10a is paragraph 137, where the court says in response or, excuse me, where the commission says in response to the court's remand, that's the D.C. Circuit's remand in the Usta case, we reinstate the local competition order of dedicated order definition of dedicated transport, and that was a definition of a network element that included entrance facilities. So what the commission is saying there, by its reference back to that definition of the network element. Scalia You do not need to provide unbundled access under C-3 to entrance facilities, right? Miller That's correct. And the court of appeals, I think, perceived a contradiction between saying that this isn't something to which you have to provide unbundled access under C-3, but it is something that has to be made available for interconnection under C-2. And there is no contradiction there, because these are separate, independent statutory obligations. And what's particularly significant about the difference between the two statutes is that C-3 has an impairment test. You only have to make available those network elements without which the competitor would be impaired in its provision of service. C-2 does not have an impairment test, and that's because Congress recognized that interconnection is absolutely fundamental to any effective telephone competition. Breyer So what's the definition difference between entrance facility and interconnection facility? How do we know which is which? Miller If you are referring to the way the commission used those terms in the Breyer I'm not. I want to know what the difference is. Tell me in English what the difference is. Miller An entrance facility Breyer No, no. I mean, how do we know which is which? We see some big lines and stuff in it. How do we know which is which? Miller Well, an entrance facility, as the commission explained in the TRRO, is just the link between the incumbent's office and the competitor's office. And an interconnection facility is anything, any part of the network that's being used for interconnection. Scalia It's a genus, and the entrance facility is the species, in your estimation. Miller It can be when it is used for interconnection. It could also sometimes be used for other things, but we're talking about the situation where the competitor wishes to use the entrance facility for interconnection. Roberts I'm sorry. Could you run that by me again? Miller The entrance facility is just the link between the two offices, the incumbent and the competitor. That can be used for a couple of different purposes, but one of the purposes for which it can be used is interconnection. And when it is being used for that purpose, it is appropriately described as an interconnection facility. Ginsburg Mr. Miller, would you, before you sit down, explain what is the government's position when an agency is asked to file a brief? The Sixth Circuit asked, invited the FCC to file a brief. It did, and the Sixth Circuit disagreed. And there was some suggestion that when an agency files a brief here, in this Court, as opposed to a court of appeals, it deserves more weight. Miller We agree with the view expressed by Judge Sutton in his dissenting opinion below that there really is no reason to distinguish between amicus briefs, particularly those filed at the invitation of a court in the court of appeals, from those filed here. In this case, of course, the question is Scalia But there may be a reason to give less weight to briefs in this Court that differ from the briefs filed with the court of appeals. And you have taken a different position here on the issue of whether, when backhauling is included, it's part of the interconnection facility? Miller No, our Scalia I do not think you made that distinction below about, you know, oh, it is part where there is backhauling, where there is not backhauling, but where there is, it isn't. Miller I think our briefs in the two cases are consistent. Our brief here provides more detail in explaining the commission's orders. But in both cases, we have taken the view, as the commission has consistently taken the view since the TRRO, that entrance facilities don't have to be made available as unbundled elements for purposes of backhaul, but they do have to be made available when the incumbent seeks to use them for interconnection. And I think this is precisely the sort of case where Scalia They have to be made as unbundled elements? I thought they never had to be made as unbundled elements. That's C-3. Miller That's right. Scalia Your argument here is that they only have to be made available under C-2. Miller Exactly. Scalia Which is not unbundled. Miller Right. And it's only for purposes of interconnection. And I think this is precisely the sort of case where deference under our is appropriate, given that you have a highly complex statute regulating a very complex dynamic industry, and so the commission's regulations involve not only the exercise of the statute. Scalia It certainly encourages us to throw up our hands, there's no doubt about it. I mean, I — another way of saying that would be that it's appropriate to recognize the commission's not only policymaking discretion, but technical expertise in the industry that's being regulated. And certainly the commission has tried to be as clear as it can in its regulations, but this is an area where some level of imprecision is probably inevitable. And I think that's why it's appropriate to defer to. Kennedy Well, I don't know why it's so hard. I mean, I got out my orange cord and I was — But I wasn't sure if it was a transport or link. That's my concern. Miller Well, I guess I would say maybe we need to put the difference between interconnection and transport in concrete terms. It would be that the interconnection charge, which is at TELRIC rates under 252d1, there would be a flat fee for setting it up and then a flat monthly fee just for having the link there. Scalia Oh, continue. Miller Thank you. And that's independent of usage. Then separately, each time a call is made, there is a charge under 252d2 for the transport and termination of the call, and that goes both ways. So when the competitor's customer calls the ILEC, the customer, the competitor pays the ILEC for terminating the call, and vice versa. Thank you. Roberts Thank you, Mr. Miller. Mr. Engstrich. Engstrich Thank you, Mr. Chief Justice, and may it please the Court. In this case, the agency is trying to use an amicus brief to interpret a few sentences in orders from years ago to create a new legal rule without ever going through a process that would result in judicial review. In fact, in the triannual review orders where the agency supposedly announced this new obligation, it assured incumbents like AT&T that it was not altering its interpretation of the statutory interconnection duty, and the government correctly concedes here that before those orders, the government had never interpreted the statutory interconnection duty to require companies like AT&T to sell a fiber-optic cable at TELRIC rates. Yes. Sotomayor Counsel, I know you're saying that, but everybody's arguing about what the TRO and the TRRO say or don't say. But I go behind that and I go — I think the government's entire argument is not based even on those. It's based on the LCO regulations themselves. They've cited two, which is 51.305 and 51.321. They're not relying on those TROs and their back-and-forth there. They're relying on the regulation. Well, Your Honor, I actually read their brief differently, and I note that in the Sixth Circuit they didn't rely on any regulations at all. The argument was entirely based on paragraph 140. But going to the regulations, at the same time they promulgated those rules, the government did define interconnection to exclude transport. And when they defended that, excluded it. Sotomayor How do you address their point that there are two different charges at issue? That one — that interconnection by definition includes transport. It's hard for me to think of how it doesn't, because it's got to travel from one place to another. Your Honor, when the FCC explained this to the Eighth Circuit, what it said is there are really three things going on. One is C-2 is the duty to interconnect at a point, not to provide a whole host of facilities that get you to the point, but literally the duty to interconnect at a specific point in the world, selected by the competitor to be sure, but that only tells you where interconnection occurs. That's the point. The commission then said, okay, then there are other obligations in the statute. One of them is in section 251b-5, and that's what obligates the incumbent to accept telephone calls that are sent to that point and to send telephone calls through that point to the competitor. And then there's the third thing, and this is directly from the government's brief to the Eighth Circuit, where they explain that section C-2 is the Eighth Circuit. We cite this. From 1996, this is the contemporaneous view of the agency at the time it promulgated the interconnection regulations. It's defending those regulations against a challenge that they are too narrow. And what the agency says to the Eighth Circuit, which then deferred to this interpretation, is if section C-2, interconnection, included routing and transmission, C-2 would overlap with other sections that, one, describe a duty to route and transmit traffic, telephone calls, and, two, a duty to lease facilities that will be used for routing and transmission. Footnote, those duties are B-5 and C-3. To the extent there is a duty to lease the facilities, the fiberoptic cables that competitors are going to use to get to the interconnection point of their choice, that duty has to arise, the commission is saying here, only under section 251c3. And we know it doesn't arise under that section, because these aren't things that are bottleneck elements. These aren't things that competitors can't get themselves. Competitors are interconnecting today, wireless carriers, other competitors. Everyone in the State of Ohio has since 2005 not been paying TELRIC rates. And as the amicus brief showed, there has been no detriment to competition. Interconnection is occurring. And so what the government is trying to do here is impose this leasing obligation under the interconnection duty in a way that never gave AT&T and other incumbents any opportunity to challenge it. They never explain how it squares with the text and structure of the statute, with their prior statements, or why there is any policy basis for interpreting what they claim is an ambiguous statute to require TELRIC pricing for things that are not bottleneck elements. Back in the local competition order, Justice Sotomayor, when they adopted the TELRIC methodology, they recognized, this is in paragraph 702, interconnection services, that's what they called it back then, are bottlenecks, not things that are buy-from-third-parties in the marketplace, as the agency has found is the case since 2005. They never ---- Sotomayor, now you're reading limitation into the statute. All the statute says is you're obligated to provide interconnection services. It doesn't say how or limited only to things that are not bottlenecks or things that are bottlenecks. It just says you're obligated to do X, and that's what the agency is saying. I understand, Your Honor, but if the agency had ever done that through notice and comment with a rule and published it in the Federal Register, which they concede that before 2003 they hadn't done that as to entrance facilities, and they claimed they had no occasion to address the question, and then in 2003 we get a single sentence in a paragraph of an order where there was no notice they were considering interconnection duties, no publication of a new regulation, no publication of nothing that would have been, you know, told AT&T and other incumbents, you should seek judicial review of this if you think it's wrong. And now we're being told 8 years later that when they said facilities in that paragraph, they meant entrance facilities, and we're being told 2 years later when they said interconnection facilities that they meant entrance facilities, even though when they were asked that question by the Sixth Circuit, they said we didn't define that term. And Mr. Miller might want to say they've just said a little bit more now, but they've said something radically different. Sotomayor, in that regard, in all of these years, are you mean to tell me there is no other incumbent that has provided interconnection services at an entrance facility and charged toll rates? Prior to 2003, in 2005, when there was an unbundling rule in place, and the commission had always recognized when it established that unbundling rule in 1996 that competitors would use unbundled transport facilities to connect to incumbent switches, so to connect to those interconnection points. And sure, prior to 2005, when the unbundling rule was in place, competitors would lease these facilities and pay toll rates and use them to get to the interconnection point. But there was never during that time any statement that even if there was no impairment, Section 251c2 would require the exact same thing to get to the interconnection point. And what happened to the unbundling rule? It was gotten rid of. It doesn't exist anymore. So now AT&T has said those things you used to buy under the unbundling rules, we don't have to sell them to you at toll rates anymore. We have a tariff. We've always had a tariff. We'll sell them to you at just and reasonable rates under the tariff. You can build them yourself as competitors and wireless carriers are doing. You can buy them from the third parties that build them and advertise their offering of them. But what you can't do is say all of a sudden that the interconnection duty had always required the exact same thing as the unbundling duty, at least not without going through a rulemaking where you lay out your policy ground. Scalia Why was the unbundling rule abandoned? It was abandoned because the record evidence showed unambiguously that competitors don't need these things from incumbents. It's not a bottleneck. It's not in any way, shape or form a bottleneck. And I guess that gets to the second point I'd make, which is that, again, and I don't think they rely on the regulations, Justice Sotomayor, and they've never, and the government concedes in footnote 6 that the regulations themselves don't get them where they want to go. They need these statements they made in 2003 and 2005. And even if you credit their new position that when they said facilities and interconnection facilities, that was just an imprecise way of saying entrance facilities, those statements don't get you to the rule that they're endorsing. What the agency actually said is that competitors will have access to these facilities and let's pretend that means entrance facilities for the time being, will have access to entrance facilities at cost-based rates to the extent that they require them to interconnect. And that's paragraph 140 of the Triennial Review order and the remand order, and they said the same thing, although they used the word need. Scalia Which is C-3. Well, I think the point is what they – this is why we think the right reading of those statements is that the facilities they're referring to are things they actually do require and need, which are the things inside AT&T buildings that they can't replicate, that it's strange for them to have said you're going to get these facilities you require, but to have meant something that they don't in fact require. But even if you want to read, again, facilities and interconnection facilities to mean entrance facilities, the rule that they're endorsing, and, you know, Michigan now wants if it's in the ground, we have to provide it, if we'd have to build it, we don't have to provide it. It's the first time we've heard of that in the scope of litigation. The government seems to only be willing to talk about those few facilities that had been gotten under the old, now-gone-unbundling rules. But that's not the distinction that the commission drew when it said this thing that's supposedly imposing an obligation on AT&T and other companies. It limited it to those things that competitors require. Sotomayor But that's C-3. Verrilli, C-2 says you just, you have to. It imposes an affirmative obligation to provide an interconnection, an interconnection. Verrilli, C-3. Well, it imposes an obligation, Your Honor, to provide interconnection at a point, a point within our network. Scalia Excuse me. That's your point, I thought. I thought it is precisely your point that it is C-3 rather than C-2. Verrilli, C-2. My point is, yes, if there is a facilities leasing obligation, it has to exist under C-3. That's absolutely right, Justice Scalia. We think that's the right reading of the statute. We think that's what the FCC told the Eighth Circuit. We think it's what the FCC said in the local competition. Breyer, I don't — there's no way for you all to go to the FCC and decide what part of this thing is, or any State regulator, what part of it is part of what's necessary to facilitate interconnection, and what part of it is really providing the work primarily of simply transporting services, or what part is doing something else. There's really no decision. There's no way to do that? No. Okay. So a judge has to say, on the basis of what? On the basis — the judge has to say on the basis of the statute, which just uses the word interconnection. The Michigan Commission decided that the FCC in that paragraph 140 created this obligation. That's wrong. I thought it was conceded that none of this is necessary under C-3. I thought that's what the Eighth Circuit said, which is why they eliminated the unbundling obligation under C-3. That's absolutely right, Your Honor. So it is accepted by both sides, I think, that this is not necessary. That's right. And because it's not necessary, you can't read, as the government tries to belatedly years after the fact, those statements in their orders from 2003 and 2005, those few statements in these massive orders. That doesn't help, because it's a network element, if it's in 3. And what this is is something that's going to be needed to interconnect if it's in the first one. And I don't know which is which, and I gather that sometimes it would be tough, and what courts used to do with the ICC when they got into this kind of situation is a doctrine called primary jurisdiction, and they'd ask them for a brief, all right? So if that's what we've done hypothetically, we have the brief. Now, why don't we have to follow the brief? Because the brief here doesn't do what a decision on a primary jurisdiction referral would do, which is square what the agency is doing with the text and structure of the statute, with prior statements that contradict. Scalia. Do you agree that it has to be needed to interconnect? Your Honor. The whole problem here is it doesn't have to be needed to interconnect. It has to be needed under C-3, but under C-2, it's up to the new company to say, I want to interconnect here, and the incumbent cannot say, oh, no, you don't have to interconnect here, you can interconnect somewhere else. Your Honor, that's absolutely right, Justice Scalia. They get to pick a point. The point has to be within our network. Rule 51-305 identifies a series of illustrative points, all of which exist inside AT&T buildings. And that's what they've done. They've picked a point. Sotomayor, don't the regulations now in the commission's TRO, et cetera, say that an entrance facility is within your network? You haven't challenged that. Well, we do disagree. I mean, at the time of the trainee review order, they said it was outside of our network. And that's where they also supposedly adopted this rule. So somehow this rule they've adopted has to coexist with the notion that these things are outside of our network. But in or out, I think it's important to recognize, they're not claiming. If they're in your network. Pardon me. I think if you have the network engineer's brief, figure 4, on page 19, I think it does a very good job of illustrating what it is we're talking about. It's like orange wires and such? They draw them in black, but yes. Figure 4? Figure 4 on page 19. What the competitors in this case in Michigan have long said is that the competitor has picked as its point of interconnection a point inside the box on the right, labeled incumbent local exchange carrier central office, and then they need some fiberoptic cable to bridge the gap to that interconnection point. That's how Judge Sutton understood it in dissent. That's how Judge Batchelder understood it in the majority. And all the interconnection duty talks about, all any of the interconnection regulations talk about, is letting the competitors pick that point. How they get to the point is up to them. Breyer. That's not what the statute says. The statute says that the carriers have a duty to provide interconnection. Right. Now, in carrying out a duty to provide, you say that's just picking a point. But somebody could equally well say, no, it's a duty to provide means to get to the point. Now, either of those seem equally consistent with the language. Your Honor, there's more language that I think forecloses those interpretations. It's not just the duty to provide interconnection. It's the duty to provide interconnection for the competitor's facilities and equipment at a point within the incumbent's network. Nothing in that statutory language says that the duty is to provide the competitor with the facilities and equipment. Breyer. No, but it doesn't say that, but it doesn't say the opposite. And therefore, you might have an agency reasonably deciding that to provide, to fulfill that duty, you must provide equipment reasonably necessary to allow the competitor to connect. That's equally sensible. And, Justice Breyer, you might have an agency that did that. We don't have an agency that did that. Apparently, you have an agency that never really said one way or the other. And that means that Michigan was wrong when it thought that the agency had said it, and the Sixth Circuit was right. Well, it used to say the other. You contend it used to say the other, and it has never, by proper means, gainsaid its prior position. That's correct, Justice Breyer. I don't see what the other. I didn't hear anything that said they said the other. They said when you have wires and you're using the wires for communication, then they don't fall outside this. That's true. But if you're using them for interconnection and they're necessary to use for interconnection, maybe it does fall inside this. I don't know. Justice Breyer, again, we'd point you to their definition of interconnection, where they excluded transport from interconnection and explained to the Eighth Circuit's conclusion. They excluded all transport to the point of interconnection where you could not provide the facility to interconnect unless you had the transport. Is that what they did? What they said is that they do that, yes or no? I bet the answer is no. What they said ‑‑ I just don't think you're describing it in the way that consists of the language of the Act. What they said is a duty to lease facilities that will be used for routing and transmission of telephone calls to the point, that's C-3. That's not part of the interconnection duty. When they contrasted in their local competition order, paragraph 172, they said what interconnection does is it lets the competitor pick the place where they're going to drop the traffic off. But it is section C-3 that lets the competitor say I'd prefer to use incumbent facilities at Telric rates to get to that point. They have made that very distinction. But what they're trying to do through their amicus brief here is to turn C-2 into a facilities leasing provision. Now, again, we don't think this Court needs to say that they could never have promulgated a rule with reasons that would get you there, but they've never done it. If they had done it, we would have had the opportunity to seek judicial review. They would have had to explain themselves. We've never had that opportunity. When they said ‑‑ and I think it's important. When they put out these sentences in the Triennial Review order and Triennial Review remand order that supposedly told us of this new obligation, they never asked for notice about this, even though in their notice of proposed rulemaking they said should we get rid of entrance facilities under C-3. They didn't say and if we do, what would that mean for C-2. They didn't ask the question. Scalia. I thought they said moreover that they were not amending C-2 specifically. Verrilli, That's exactly right. In the orders themselves, they assured AT&T and others that they weren't changing anything. Breyer. There are cases, I think, in primary jurisdiction where what a district court has done anyway is to hold the case while the ICC went and had a proceeding. And I'm sure that hasn't been used in a long time. No, that is still used, Justice Breyer, but I'd point ‑‑ Maybe this is the case for it. I don't think it is. And I'd point to this Court's decision by Justice Ginsburg in Northwest Airlines v. Kent, 510 U.S. 355, where this Court said nobody has asked us to invoke the doctrine of primary jurisdiction, we're not going to do it, instead we will adopt an interpretation of the statute that will suffice for the purposes at hand. And as the Court later recognized in Brand X, that leaves it open to the agency in a rulemaking to actually do the work that, as Justice Scalia noted, the agency has never done here. And so it's rather than imposing something through a combination of amicus briefs and statements that don't actually set forth the rule that the agency is trying to defend here, we'd have a real rulemaking and a chance. Sotomayor, I guess the problem I'm having is that you tell me in the one hand that up until, what, 2005, you were always paying the cost plus profit rates, the TELREX rates, for interconnection at a ‑‑ at an entrance facility. It's not quite right, Justice Sotomayor. Up until 2005, companies like Talk America were allowed to get both the actual physical linking at TELREX rates and the transport facility at TELREX rates, but under two separate statutory provisions. They were getting the transport facility under C-3. That's gone away. They were getting the linking under C-2. Now, there were other companies like wireless carriers. They were getting the linking at TELREX rates under C-2. But they were paying full freight for the transport because they have never been allowed to get unbundled network elements. So this notion that there's going to be a price increase to wireless carriers is a fiction. But what ‑‑ so competitors were doing two things under two provisions. One of those has gone away. And it was only after it went away that anybody raised this notion that maybe that transport facility had always been required under C-2 also. But that's nothing the commission has ever done in a rulemaking. It never did that in the proper way in the training review order or the training order review remand order. As Justice Scalia noted, it assured AT&T and other incumbents that it wasn't changing the law. When it published things in the Federal Register, which is where it's supposed to publish substantive rules, it identified specifically the elimination of entrance facilities as unbundled network elements and said not a word about any continued duty to provide them under Section 6, if you want. Sotomayor, it did in its footnotes. It said that's what the whole dispute is about, which is we're not changing the obligation to provide interconnection services. So it said it clearly. It said it clearly. But then the question, Justice Sotomayor, is, well, what was that obligation? And the government concedes in footnote 6 that prior to making those statements, it had never interpreted that obligation to include the duty to lease that transport facility. It claims the question never came up, because while it was an unbundled element, it didn't matter. Now, I think it's quite telling that while it was an unbundled element and we were having 10 years of litigation about what the right standard is for an unbundled element, nobody even thought to say, by the way, all of this litigation is beside the point with respect to the use of these facilities, when we attach them to an interconnection point. Scalia, the Eighth Circuit's decision would have been unnecessary in the revision of the rule. Verrilli, Exactly, Justice Scalia. It's very strange that no one, I mean, and I think from the fact that nobody thought to say it, it comes to what we view has happened, is that this is a rearguard effort to preserve Teller pricing for things that the commission said should no longer be available as Teller pricing. Scalia, Maybe the commission didn't like the Eighth Circuit's decision. I think it's probably a fair statement that the commission does not like the decision's vacating its unbundling rules, but nonetheless, that's what happened and the new rules get rid of this element. What the Michigan Commission found was that the FCC had specifically determined that there is a leasing obligation under C-2. That never happened. The Sixth Circuit was right about that. There is no leasing obligation that the commission has ever established. I think, Justice Breyer, to go back to your question, whether they could do it is a separate question. I don't think they could. I think we have an incredibly good chance to prevail if they were to ever promulgate such a rule. But they never did it. They said things directly to the contrary. Breyer, It all didn't matter because, in fact, they got the Teller rates under C-3 until they changed the impairment part. Verrilli, Right. Breyer, So who cared? And now after that, they care. Verrilli, Right. They care. Breyer, And now your other side cares, of course. And so now we are faced with a situation where they are just putting this in the brief for the first time, but they can't base it on anything the commission actually did. Verrilli, That's exactly right. And if the commission had actually done that. Breyer, I'm glad it's right because I don't know what I'm talking about. Verrilli, I'm glad we are at least agreeing with each other, Justice Breyer. But, and I think that really is the key administrative law point here, is that if the agency in the Triennial Review Order or Triennial Review Remand Order had actually said what they say in their brief, we never had occasion to consider this question before, now we are considering it, and here is why we think it's appropriate to read C-2 to impose leasing, despite the fact that, you know, again, the commission claims that the statute is ambiguous, they need a policy reason why it's appropriate to read this ambiguous statute to require Teller pricing for things that third party business models with this Teller pricing for something that competitors can and are building themselves, third parties are selling in the marketplace. Sotomayor, if we accept their policy arguments, what does that do to your main argument? Because I think I've explained it to my satisfaction why this is necessary, because C-2 requires interconnection. Congress has made a judgment that interconnection is the mainstay of competition in this area. So if I accept that. With due respect, Justice Sotomayor, I don't think they've made that policy claim here. And in particular, this is not a case about whether interconnection is going to occur. Competitors and wireless carriers are picking their points of interconnection. They are interconnecting today. They have been doing it. I mean, again, wireless carriers never had Teller-priced transport facilities, and yet they are interconnected. Competitors in nearly a dozen States that have addressed this issue and disagreed with Michigan and agreed with the Sixth Circuit are interconnecting today, using their own facilities, using third-party facilities. And when they come to AT&T and say, we'd like to plug our facility into this point, AT&T says, absolutely, and does the work necessary to get those two things connected. Scalia. It doesn't say it that happily. It really doesn't. Verrilli, You're right. It's certainly. Scalia. Well, okay. Verrilli, It's an imposition on AT&T. But the notion that in any way, shape or form, the price of the cable will alter the interconnection of telephone networks is simply false. Yes, interconnection is an important policy, and Congress said we have to provide it at points within our network selected by competitors, and we do that. But Congress didn't say, and the FCC has never said, that we also have to provide them whatever it is that they want to use to get to that point. And there really is, and I think some of the questioning pulled that out, though I want to say, I think because the government won't endorse the absolute position the Petitioners were taking in their opening briefs, that this is only about things that used to be ordered as unbundled elements or things already in the ground. But their position, their interpretation of the statute has no stopping point. It would cover anything a competitor might ever want to use to get telephone calls to the interconnection point. And they've never defended that limitless reading. And if the agency ever wanted to adopt it, we would challenge it. And as I've said, I like our chances. But until they do it, Michigan was wrong to conclude that the Commission had done it, and the Sixth Circuit was correct to reject that. If there are no further questions, I'll sit down. Roberts. Thank you, counsel. Mr. Bruce, you have four minutes remaining. Your Honors, everything you heard in the last 30 minutes is premised on the idea that the FCC is doing something new and that there was never a promulgated regulation. That is demonstrably false. If you turn with me to page 32A of the red brief, this is the FCC's regulation, promulgated all the way back in 1996, which defined the scope of the C-2 interconnection obligation. It's 47 CFR 51.321. And this goes directly to the points that Justice Sotomayor was making. On page 32A, the FCC says that an incumbent must provide interconnection at a particular point upon a request by a telecommunications carrier, such as a competitor. Technically feasible methods, this is in sub B, include but are not limited to, and they give two examples, co-location and meet points. But this isn't the be-all, end-all of interconnection obligations. These are exemplary. To take an analogy, assume you had a high school cafeteria and the school board said you have to provide vegetables to students when they ask for them, and you have to give them the vegetable that they ask for. Those include broccoli and green beans, and they don't say anything else. Then you have a separate obligation in C-3, and the school board says, until we see that the kids have enough nutrition, you must give them peas. That's entrance facilities unbundled under C-3. So some time goes by and the school board says, okay, the kids are getting enough peas, we're going to wipe away that second restriction. But the initial restriction, the obligation in 321 is still there. And if a student asks for peas, it's within the scope of 321, because broccolis and green beans were representative examples and peas are another one. And that's for entrance facilities. Scalia, why did they fight the Eighth Circuit litigation? Why did they? I mean, you're telling me it made no difference whether C-3 allowed them to do what they wanted to do and what the Eighth Circuit said they couldn't do. Right? The premise that's incorrect, Your Honor, because if you have an entrance facility under C-3, you can use it for more things than you can under C-2, because under C-3 you can have it for backhauling and still get TELRIC rates. Under C-2, you're limited to interconnection, so it's a different question. But the idea that somehow the FCC did something new. Scalia, that's not that big a deal. Backhauling is a big deal to competitors. And so to say that they did something new and the TRRO is wrong, and to prove that point, if you looked at the comments that you made. Scalia, where do you get that backhauling restriction from? The backhauling? Yeah, yeah. From the TRO and the TRRO. And the FCC discussed that distinction in the Sixth Circuit briefing at pages 6 to 7. So this isn't anything new either. So the fact that this is not something new is demonstrated conclusively by comments in the TRRO proceedings from Bell South, which is now an AT&T subsidiary. And Bell South says at page 59 of its comments, "...fully recognizing the obligation that went all the way back to 1996 in Reg. 321, because entrance facilities may be required for interconnection purposes and Congress explicitly enacted provisions that govern carrier obligations to provide interconnection in 251c2, it was altogether reasonable for the Commission to exclude these network elements from a definition of ILEC-dedicated transport intended for unbundled access under 251c3." So even incumbent carriers knew what the FCC was doing in paragraph 140 of the TRRO, and there was nothing new there. One other small point with respect to the Network Engineers map. This entrance facility right here on page 19 already exists. We're talking about existing facilities. And it's true, as the Sixth Circuit said, that if the point of interconnection is here at the ILEC switch, then that's where interconnection takes place, and this entrance facility is truly providing transport, not interconnection. But when a competitive carrier chooses its own switch as the point of interconnection, this is the end of the AT&T entrance facility, then interconnection takes place there. And even in the Sixth Circuit's view, that entrance facility is interconnection under c2. And as Congress has said, that's the obligation that is immutable because it is so important, fundamental to competition. Roberts. Thank you, counsel. The case is submitted. Thank you.